UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br>v.<br><br>NATHANIEL J. BOYCHIEF,<br><br>  Defendant. | Case No. 2:20-cr-00124-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant Nathaniel J. Boychief's Motion to Suppress. Dkt. 20. On February 10 and 11, 2021, the Court held an evidentiary hearing, heard oral argument, and ultimately took the motion under advisement.[1] Upon review, and for the reasons set forth below, the Court DENIES the motion.

## II. BACKGROUND

On April 24, 2020, Bonner County Sheriff Deputy Jinright observed a truck leaving a house suspected of drug trafficking and other nefarious activities. Deputy Jinright followed the truck and was going to initiate a stop due to traffic violations, but he could not position his vehicle behind the truck as he wished. He radioed for support.

---

[1] Due to the duration of the hearing, the Court ordered the parties to present their closing arguments via written briefs. The parties submitted their briefs for the Court's consideration. Dkts. 41–43.

Sandpoint Police Department Officer Jeremy Inman responded and pulled over the truck on suspicion that it did not have proper mud flaps or fenders covering the part of the rear tires that were more than ten inches from the surface of the pavement in violation of Idaho Code § 49-949. After the truck came to a stop, Officer Inman approached the driver—Boychief—and requested his license, registration, and insurance information. Boychief's minor child and father were in the vehicle. Boychief provided his license and registration, but he did not have a physical copy of the insurance. So, he told Officer Inman that he would use his cellphone to find an email with the insurance document.

Within roughly one minute of the initial stop, Deputy Jinright joined Officer Inman on the scene, standing near the passenger side of the truck. Officer Inman included in his police report written that day that, while Boychief was looking up his insurance on his phone, he "could smell the odor of marijuana coming from inside the vehicle." Dkt. 20-5, at 74. This smell prompted Officer Inman to ask if there were any weapons in the truck or if there would be any reason for his drug-detection dog—Bindy—to alert to an odor of narcotics. Boychief responded no to both questions. Officer Inman then told Boychief to continue looking for his insurance and to let him know when he had located it. At this point, Officer Inman stepped away from the vehicle and allowed Deputy Jinright to stand on the driver's side of the truck to wait for Boychief to retrieve his insurance. Deputy Jinright stood a few feet away from the rear driver side door of the truck. Meanwhile, Officer Inman retrieved Bindy from his patrol car.

Officer Inman then proceeded to walk Bindy around the vehicle. As Bindy walked around the vehicle, she initially passed but then worked her way back to the front passenger wheel well and sat to signal for drugs. Thereafter, Officer Inman returned Bindy to his patrol car and asked Boychief to exit the vehicle. At this point, Boychief had still not found a copy of his insurance. Officer Inman informed Boychief that Bindy alerted to the odor of narcotics coming from the truck and told Boychief that he could smell a "light hint" of marijuana coming from the vehicle. Boychief thereafter admitted that he had smoked marijuana earlier and that there was marijuana in his pocket and in the truck. *See id.* at 75. After this brief conversation, Officer Inman frisked Boychief, discovering a container of marijuana. Officer Inman placed Boychief in handcuffs and began to search the truck. Throughout the duration of the search, Deputy Jinright alternated between assisting Officer Inman in his investigation and speaking with Boychief. A large amount of methamphetamine, plastic bags, and a scale were found in Boychief's vehicle, which led to Boychief's arrest for the present charges against him.

After arresting Boychief, Officer Inman and Deputy Jinright received his consent to make a call on his cell phone to a relative who could pick up the minor child. Deputy Jinright physically assisted Boychief in locating the relative's number in his phone as Boychief was in handcuffs. After the call was made, Deputy Jinright and Officer Inman both handled Mr. Boychief's phone to switch it to airplane mode. Deputy Jinright needed Officer Inman's assistance because he was not familiar with Android phones. As Officer Inman put the phone in airplane mode, a text message was delivered and appeared on the

cell phone's screen asking Boychief if he was "getting the stuff." This was included in the warrant to search the contents of Boychief's phone.

Having transferred Boychief to a third officer, Officer Inman and Deputy Jinright discussed the stop and search. During that conversation, Officer Inman repeated his claim that he smelled marijuana on Boychief. In response, Deputy Jinright mentioned that he did not smell any marijuana. Neither Officer Inman nor Deputy Jinright measured the truck's tires to confirm that Boychief's truck violated Idaho law. However, another officer later confirmed that the absence of mudflaps did violate Idaho law.

On June 16, 2020, a federal grand jury indicted Boychief on one count of Possession with Intent to Distribute. Dkt. 1. On September 22, 2020, Boychief filed a Motion to Suppress in which he contends that all the evidence stemming from the traffic stop should be excluded because his Fourth Amendment rights were violated. Dkt. 20. The Government opposes the motion and maintains that nothing improper occurred. Dkt. 21. Boychief replied. Dkt. 22. The Court held a hearing on the matter and ordered the parties to make their closing arguments by way of written briefs. The parties have filed those briefs (Dkts. 41–43), and the issue is now ripe for adjudication.

### III. LEGAL STANDARD

The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches and seizures by the government. U.S. Const. amend. IV. While "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands," *United States v. Leon*, 468 U.S. 897, 906 (1984),

the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect," *United States v. Calandra*, 414 U.S. 338, 348 (1974). Under the exclusionary rule, "illegally seized evidence" cannot be used "against the search victim in a criminal trial." *Id.* at 350; *see also Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

When a defendant challenges a warrantless search or seizure, the government bears the burden of establishing by a preponderance of evidence that the search or seizure did not violate the Fourth Amendment. *See United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992); *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991); *see also United States v. Jeffers*, 342 U.S. 48, 51 (1951).

## IV. ANALYSIS

Here, Boychief advances three arguments to support his claim that all the evidence stemming from the search of the truck should be suppressed. First, he contends that Officer Inman did not have reasonable suspicion to initiate a dog sniff and go beyond the scope of the traffic stop. Next, in the alternative, Boychief contends that, even if there was reasonable suspicion to carry out a dog sniff, there was not probable cause to search the truck due to the unreliability of Bindy's alert. Lastly, Boychief contends that Officer Inman exceeded the scope of consent in reading the text message that appeared on the screen of

his cellphone when Officer Inman helped Boychief call a relative to retrieve the minor child.[2] None of Boychief's contentions have merit.

## A. Prolonged Traffic Stop

A seizure, though initially lawful at its inception, can violate the Fourth Amendment if its manner of execution unreasonably infringes interest protected by the Constitution. *United States v. Jacobsen*, 466 U.S. 109, 124 (1984). A seizure that is justified solely by the interest in issuing a ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission. *Illinois v. Caballes*, 125 S. Ct. 834 (2005). Further, an officer must initially restrict the questions he asks during a stop to those that are reasonably related to the justification for the stop. Such reasonably related questions may include addressing the traffic violation; attending to safety concerns;

---

[2] For the first time in his closing argument brief, Boychief asserts that the initial traffic stop was unlawful. Dkt. 41, at 1. And, in a footnote, he states that there was confusion about whether he was challenging the stop at the hearing. *Id.* at 1 n.1. Any confusion was Boychief's fault. Boychief did not raise the issue in his Motion to Suppress or Reply. *See generally* Dkts. 20, 22. Indeed, Boychief's motion has a section titled "Initial Traffic Stop for alleged mud flaps violation." Dkt. 20, at 6. But rather than arguing that the stop was unlawful, he argues that Officer Inman exceeded the scope of the stop without reasonable suspicion. And nothing in Boychief's Reply comes close to a claim that the initial traffic stop was unlawful. At the hearing, when the Court asked Boychief's attorney whether Boychief was challenging the initial traffic stop, his attorney never clearly stated that Boychief's position is that the initial stop was unlawful or invalid. What's more, in the very closing argument brief where he claims the stop was unlawful, Boychief does not develop his claim with any argument or cited authority whatsoever on the topic. *See generally* Dkt. 41. Nor does he at any point in his final closing argument brief. *See generally* Dkt. 43.
  In short, because Boychief did not raise the issue before the suppression hearing, he waived it. *See United States v. Murillo,* 288 F.3d 1126, 1135 (9th Cir. 2002) (holding that ground for suppression not included in pre-trial motion to suppress was waived); *United States v. Wright,* 215 F.3d 1020, 1026 (9th Cir. 2000) (explaining that "failure to bring a timely suppression motion constitutes a waiver of the issue"); *United States v. RestrepoRua,* 815 F.2d 1327, 1329 (9th Cir. 1987) (per curiam) ("Just as a failure to file a timely motion to suppress evidence constitutes a waiver, so too does a failure to raise a particular ground in support of a motion to suppress."). And, even if the argument was not waived, Boychief does not point to any reason why the stop was unlawful. Therefore, Boychief's unsupported claim that the initial stop was unlawful is both waived and without merit.

checking the driver's license, registration, and proof of insurance; and determining whether there are outstanding warrants against the driver. *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015). The officer may expand the scope of the stop only if he notices particularized, objective factors arousing his suspicion. *Id.*; *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015) ("[A]n officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion.").

Conversely, an inchoate and unparticularized suspicion or "hunch" cannot withstand scrutiny under the Fourth Amendment. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). When assessing whether an officer possessed reasonable suspicion, a court must consider the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Reasonable suspicion is more than "a mere hunch" but "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014). In other words, law enforcement officers have reasonable suspicion when they have "a particularized and objective basis for suspecting the particular person" is breaking the law. *Id.* at 396 (cleaned up).

Here, Boychief's arguments are unpersuasive. First, to the extent Boychief asserts that the dog-sniff search *temporally* prolonged the traffic stop, such an assertion receives no support from the evidence in this case. What is evident is that Bindy sniffed the truck *while* Boychief searched for his insurance information—which he had not located even

when Officer Inman returned to Boychief's truck after the sniff. Therefore, the duration of the stop was not extended in any way.

More critically, Boychief's argument that the dog-sniff search went beyond the scope or reason for the stop without reasonable suspicion is also unpersuasive. Officer Inman credibly attests that he smelled the distinct odor of marijuana emanating from the truck. This gave him a particularized and objective basis (i.e., reasonable suspicion) to believe that illegal narcotics were present.

Boychief relies heavily on *United States v. Robinson*, No. 4:19-cr-00143-DCN, 2020 WL 912744 (D. Idaho 2020), where the Court granted a motion to suppress because the officer "did not have reasonable suspicion to extend" the traffic stop. *Id.* at *3. There, the officer pulled a driver and his passenger over for a window-tint violation. *Id.* at *1. After several minutes, the officer informed the driver that he was not going to give him a ticket, but the officer nevertheless continued to question the driver for approximately eight to nine minutes. *Id.* The officer's basis for extending the stop, as he put it in his report, was he "thought he detected the odor of marijuana coming from inside the vehicle." *Id.* at *3. He also said that the driver's pulsing carotid artery and travel plans to sightsee in Idaho Falls made him suspicious. *Id.* The Court concluded that these circumstances were not enough for the officer to from a reasonable suspicion because (1) merely thinking he smelled something was not enough, (2) pulsing carotid arteries and nervousness are common encounters with law enforcement officers, and (3) the Court did not find

sightseeing in Idaho Falls to be objectively suspicious. *Id.* The Court therefore excluded the evidence found after the legitimate traffic stop had ended. *Id.* at *4.

The case at hand is materially distinguishable from *Robinson*. Here, Officer Inman did not merely think he smelled marijuana, he was sure he smelled it. And his account has remained consistent throughout the case. He included the smell in his initial report. At the suppression hearing, he explained that it wasn't an overpowering smell of marijuana, yet it was distinct. Boychief suggests that the minor differences in Officer Inman's report and testimony diminish his credibility, but the Court disagrees. Those differences are immaterial and wholly distinguishable from the differences at play in *Robinson*.

Boychief also points out that Deputy Jinright states that he did not smell any marijuana during the traffic stop. However, Officer Inman's account remains credible because he was the first officer to interact with Boychief at his truck, his close proximity to the truck (as opposed to Deputy Jinright's distance) provided him the better opportunity to smell the truck and Boychief, and marijuana was in fact found in the truck.

Boychief also offers an alternative theory that the smell of marijuana may have originated from some third-party source, such as a passerby, since Boychief's traffic stop took place in a fast-food restaurant parking lot. The Court finds this theory implausible. The dash-cam and body-cam videos admitted into evidence do not show any third party in the vicinity of the truck during the stop. Moreover, an officer does not need perfect suspicion, or to rule out the universe of alternative theories, before the officer proceeds. Rather, the officer needs only a *reasonable* suspicion to conduct further investigation.

**MEMORANDUM DECISION AND ORDER - 9**

Boychief lastly faults the law enforcement officers for not investigating the suspected vehicular code violation. But this point is also uncompelling. Such an investigation became an afterthought for Officer Inman when he suspected a more nefarious activity was afoot: possession of illegal narcotics. The Court does not join Boychief in faulting Officer Inman for prioritizing his law enforcement goals of investigating more significant illegal activities.

None of Boychief's other points have merit. In short, the Court concludes that neither officer impermissibly prolonged the traffic stop. Furthermore, Officer Inman had reasonable suspicion to go beyond the scope of the initial traffic stop to investigate a potential narcotics crime.[3]

## B. Probable Cause to Search the Vehicle

Under the "vehicle exception" to the warrant requirement, government officials may validly search a defendant's vehicle without first obtaining a warrant, if the search is supported by probable cause. *See United States v. Ross*, 456 U.S. 798, 820–21 (1982); *United States v. Fowlkes*, 804 F.3d 954, 971 (9th Cir. 2015). "Probable cause exists 'when police officers have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.'" *United*

---

[3] The Government argues that the smell of marijuana alone supplied probable cause to search the truck. The Court need not decide this issue due to the other supporting facts in this case. It is sufficient, in this case, for the Court to conclude that the odor of marijuana supplied reasonable suspicion, which is all that was necessary for Officer Inman to go beyond the scope of his initial mission.

**MEMORANDUM DECISION AND ORDER - 10**

*States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir. 2000) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

At the outset, Boychief argues that Bindy's drug alert was not reliable enough to provide probable cause to search his truck. The parties committed significant effort in their briefs and at the suppression hearing to this issue. Boychief had an expert, Andre Falco Jiminez, testify as to the problems he perceived with Bindy's sniff from the video footage. Mr. Jimenez ultimately concluded that Bindy "did not reliably alert to the presence of narcotics" in this case and that Bindy is unreliable "for the search and indication of narcotics in any case." *See* Dkt. 20-7, at 9. Boychief also focused on Bindy's less than proficient field statistics, which showed that Bindy's positive drug detections were correct at only a 39% rate.[4] For its part, the Government focuses on discrediting Boychief's arguments by providing explanations for the field statistics and the perceived problems. For instance, Officer Inman testified that many of the false positives may not have been false because drugs had been present in the vehicles before, as explained by the individuals detained, and/or there could have been drugs present, but he was merely unable to find

---

[4] Boychief repeatedly asserts that Bindy's overall correct detection rate was 39%, but in doing so, Boychief conflates negative and positive alerts. While it appears that Bindy had a 61% false *positive* rate, the Court does not know Bindy's false *negative* rate. Thus, while these statistics are not favorable, they are not as bad as Boychief suggests.

them. The Government also sets forth Bindy's up-to-date certificates and stellar training statistics.[5]

At the end of the day, the Court agrees with the Government's alternative argument—that the Court need not decide this issue. *See* Dkt. 42, at 4. Even if Bindy's drug detection was unreliable in the field (a decision the Court is not making either way), Boychief's argument regarding a lack of probable cause to search the truck is still unavailing because other indicia provided probable cause to conduct the search. This includes Boychief leaving a suspected drug house, Officer Inman's distinct smell of marijuana, and most critically, Boychief's own pre-arrest admission that there was marijuana in the truck. The only thing more conceivably indicative of a crime than a defendant's own admission is the officer personally witnessing the crime. *See United States*

---

[5] The Government also included the following quote in its closing argument brief in which the Supreme Court explains the limited utility of field statistics in assessing a drug-detection dog's reliability:

> Making matters worse, the decision below treats records of a dog's field performance as the gold standard in evidence, when in most cases they have relatively limited import. Errors may abound in such records. If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search. Field data thus may not capture a dog's false negatives. Conversely (and more relevant here), if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings. There, the designers of an assessment know where drugs are hidden and where they are not—and so where a dog should alert and where he should not. The better measure of a dog's reliability thus comes away from the field, in controlled testing environments.

*Florida v. Harris*, 568 U.S. 237, 245–46 (2013) (cleaned up).

**MEMORANDUM DECISION AND ORDER - 12**

*v. Wilson*, 699 F.3d 235, 246 (2d Cir. 2012) (reversing the trial court's determination that probable cause did not exist when the defendant admitted that he had lied and that he indeed had a marijuana pipe in the car). Here, these facts provided the officers probable cause to search the truck.

Accordingly, even if one excludes Bindy's alert to the drugs from the probable cause analysis altogether, there were still enough facts to support a finding of probable cause to search the truck under the circumstances of this case. Boychief's constitutional rights were not offended.

## C. Cell Phone

Boychief lastly argues that the officers exceeded the scope of his consent to use his cell phone to call another adult family member by rummaging through his phone and reading a text message he received. The Government argues that the officers did not exceed the scope of consent because they did not go searching through Boychief's text messages, but rather the text message appeared on the screen as they were trying to close the phone.

Generally, officers need a warrant to search a cell phone because individuals enjoy a constitutionally protected privacy interest in the contents of their cell phones. *Riley v. California*, 573 U.S 373 (2014). However, law enforcement officers may search property normally subject to Fourth Amendment protections if they are given consent to do so by its owner. *Shcneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The scope of consent is determined by an objective standard—what a reasonable individual would have understood the scope of consent to be. *Florida v. Jimeno*, 500 U.S 248, 251 (1991).

Here, Boychief's argument is unpersuasive because its factual premise is inaccurate: that is, the officers did not search through Boychief's cellphone. The evidence reflects that Deputy Jinright and Officer Inman both handled Mr. Boychief's phone to switch it to airplane mode. However, this was because Deputy Jinright needed Officer Inman's assistance because he was not familiar with phones that run on an Android operating system. As Officer Inman put the phone in airplane mode, a text message was delivered and appeared on the cell phone's screen asking Boychief if he was "getting the stuff." It was, therefore, in plain view. *Horton v. California*, 496 U.S. 128, 133–34 (1990). The officers' testimonies, the videos, and all other relevant evidence demonstrate that the officers' account of what they did with the cell phone is accurate and credible. There is simply no evidence that the officers searched through the phone.[6]

Therefore, because Boychief allowed them to use his phone and the officers did not exceed his consent, the officers did not violate Boychief's Fourth Amendment rights.

///

///

///

///

///

---

[6] Additionally, Boychief does not argue that merely placing the phone in airplane mode exceeded the scope of consent. Lastly, even if this text message were excluded from the warrant application, the other evidence in this case (e.g., the drugs and paraphernalia seized from the truck) would have supported the warrant to search the phone for illegal drug distribution. Thus, Boychief's argument is ultimately unavailing.

**MEMORANDUM DECISION AND ORDER - 14**

## V. CONCLUSION

Because the Court concludes that Boychief's Fourth Amendment rights were not violated, suppression of the evidence in this case is unwarranted. Accordingly, Boychief's motion is DENIED.

## VI. ORDER

The Court HEREBY ORDERS:

1. Defendant Boychief's Motion to Suppress (Dkt. 20) is **DENIED**.

DATED: March 12, 2021

David C. Nye
Chief U.S. District Court Judge